IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CARRIE A. MCMELLON, et al.,

        Plaintiffs,

v.                              CIVIL ACTION NO.  3:00-cv-0582

UNITED STATES OF AMERICA, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**I.  Factual and Procedural Background**

      On August 5, 1999, plaintiffs were injured when their personal water crafts went over the Robert C. Byrd Locks and Dam on the Ohio river.  The dam is operated by the United States Army Corps of Engineers (Corps) and is owned by the United States.  Although unfamiliar with the section of the river on which they were traveling, plaintiffs had not consulted any navigation charts, chartlets, maps, publications, or other navigational aids.  As they traveled towards the dam, plaintiffs failed to see any of the warning signs posted along the river.  They contend that the signs failed to signal the danger of the dam to watercraft traveling the middle of the river channel, and that some of the warning signs were obscured by bushes and trees.

      In 1993, the Corps installed warning buoys on the upstream side of the dam.  In 1995, however, the Corps removed the buoys after deciding that they posed a safety threat to vessels that were working

on an extensive rehabilitation project on the dam. At the time of the accident, the upstream buoys had not been replaced, and the signs along the river bank were the only warning to boaters approaching the dam.

The plaintiffs, alleging negligence on the part of the United States and the Corps, sued under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 742 (2000) and filed their complaint in the United States Southern District of West Virginia on September 10, 2000 [Docket #1]. On September 7, 2001, the United States filed a motion to dismiss, or in the alternative, for summary judgment [Docket #20], which this court granted on April 5, 2002. *McMellon v. United States*, 194 F. Supp. 2d 478 (S.D.W. Va. 2002). The plaintiffs appealed the dismissal to the Fourth Circuit Court of Appeals. In a panel opinion, the Fourth Circuit found that this court erred when it found that the United States did not have a duty to warn the plaintiffs of the dam's presence downstream. *McMellon v. United States*, 338 F.3d 287, 297–303 (4th Cir. 2003). The court then reheard the appeal en banc, found that the SIAA contains an implied discretionary function exception to its general waiver of sovereign immunity, and vacated the opinion of the panel. *McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (*overruling Lane v. United States*, 529 F.2d 175 (4th Cir. 1975)). The case was remanded to this court for a ruling consistent with that finding, and this written order and opinion reflects that effort.

## II. Standard of Review

Although the court is ruling on a motion to dismiss, the case is well into its discovery phase, and material outside of the pleadings has been presented and considered by the court. Therefore, the defendant's motion to dismiss, or in the alternative, for summary judgment, must be evaluated under the standard set forth in Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(c). Rule 12(c)

states that "if, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(c). Rule 56(c) states that a party is entitled to summary judgment in its favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing the absence of any genuine issue of material fact pursuant to Rule 56(c) rests upon the movant. *Collard v. Smith Newspapers, Inc.*, 915 F. Supp. 805, 809 (S.D.W. Va. 1996).

Once the movant satisfies that burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. Summary judgment is appropriate when the nonmoving party fails to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Further, in ruling on a motion for summary judgment, a trial court "must believe the evidence of the nonmovant, and all justifiable inferences must be drawn in the nonmovant's favor." *Estate of Kimmell Through Kimmell v. Seven Up Bottling Co. of Elkton, Inc.*, 993 F.2d 410, 412 (4th Cir. 1993) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Nonetheless, the nonmoving party must satisfy this burden of proof by offering more than a "mere scintilla of evidence" in support of his or her position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In the case at bar, however, much of the defendant's argument in its motion to dismiss or, in the alternative for summary judgment, is premised upon legal issues that would either deny this court jurisdiction or establish that the plaintiffs have no cause of action.

**III. Analysis**

Perceiving that this accident occurred on the navigable waters of the United States and that it therefore falls within the admiralty jurisdiction of the federal courts, the plaintiffs correctly bring their complaint under the SIAA. The SIAA is a waiver of sovereign immunity by the federal government for actions arising under maritime law. *Kelly v. U.S.*, 531 F.2d 1144, 1148–49 (2d Cir. 1976) (discussing the scope of the SIAA). This deliberate exposure to liability by the United States occurs "[i]n cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained." 46 U.S.C. § 742 (2000). However, the waiver of immunity in the SIAA is limited by a "discretionary function exception" that operates to shield the government from liability for injuries caused by the negligence of a government actor lawfully exercising his or her judgment or discretion. *See McMellon v. United States*, 387 F.3d 329, 338 (4th Cir. 2004) (establishing an implied discretionary function exception to the SIAA).

The defendant argues that decisions involving the implementation of a warning system to alert upstream boaters of the presence of the Robert C. Byrd Locks and Dam require the government actor to consider public policy matters, and that therefore the discretionary function exception to the SIAA acts as a bar to liability in this case. Furthermore, the defendant argues that, even if the discretionary function exception does not apply, the United States has fulfilled any duty it may have owed to these plaintiffs. Finally, the defendant asserts that the sole cause of plaintiffs' injuries was their own negligence. The court will address each of these arguments in turn.

**A. Application of the Implied Discretionary Function Exception in the SIAA**

The discretionary function exception's application to this case is a jurisdictional question. Therefore, the court will consider this issue before determining whether the elements of a cause of action

are present, or if any genuine issue of material fact exists.

In *McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004), the Fourth Circuit, sitting en banc, found that "the government's waiver of sovereign immunity reflected in the Suits in Admiralty Act is subject to an implied exception similar to the discretionary function exception contained in the Federal Torts Claims Act." 387 F.3d at 331. The *McMellon* court further instructed that "it is therefore appropriate for FTCA cases to guide the application of the exception under the SIAA." *Id.* at 349. Therefore, this court will apply the same discretionary function analysis employed under Federal Tort Claims Act ("FTCA") , 28 U.S.C. §§ 2671-2680 (2000), claims to the facts in this case.

The discretionary function exception to the FTCA and SIAA is a difficult area of the law because it challenges typical notions of liability. Under the discretionary function analysis, exposure to liability is based, not upon negligence, but upon questions of "public policy." The exception exists in order "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). As such, the exception is an acknowledgment that an agency, charged with the daunting task of administering a government policy or agenda, cannot be expected to create regulations that serve as a blueprint for all conceivable factual situations arising within the scope of its regulatory authority. Thus, when necessary, agencies may enact regulations that empower government decision-makers with the authority to make choices or judgments based on the underlying policy goals of the regulatory regime. Such decisions are protected from liability by the discretionary function exception to the SIAA when the decision-maker, exercising his or her government-created discretion, bases the decision on the policy concerns of the governing regulatory

regime.

On the other hand, agencies rarely attempt to regulate menial, everyday decisions. To do so would be excessive because such activity is often too trivial for regulatory oversight and cannot be said to be motivated by the policy of the regulatory regime.[1] It is only those choices or decisions made by a government actor, under the implied or express authority derived from statute or regulation, and in furtherance of the policy goals of the regulatory regime, that are protected from liability.

The test for determining the application of the discretionary function exception was developed by the Supreme Court in *Berkovitz v. United States*, 486 U.S. 531 (1988) (establishing a two-part test), and *United States v. Gaubert*, 499 U.S. 315 (1991) (instructing courts on the application of the two-part test). The first part of the test requires determining "whether the governmental action complained of 'involves an element of judgment or choice.'" *Berkovitz*, 486 U.S. at 536. The *Berkovitz* Court found that no element of judgment or choice exists when "a federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow." *Id.* at 536. In that situation, the government actor "has no rightful option but to adhere to the directive."[2] *Id.* The *Gaubert* Court explained that this conclusion is required, not because it would be *negligent* to ignore the mandates of a regulation, but because the decision could not be consistent with the underlying *policy* of the regulation. "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 316. Thus, under the first part of the test,

---

[1] For example, if a regulation instructs a government actor to dig a trench, the actor's choice of whether to use a maddox or a shovel can hardly be said to be based on the policy concerns behind the regulation.

[2] The conclusion is consistent with the goal of the exception: preventing the judicial process from interfering with legislative and administrative policy-making privileges.

6

where a government agent acts under the authority of a statute, regulation, or agency policy, the court must ask whether that statute, regulation, or policy carves out an area of less rigid regulatory supervision in order to permit the agent to consider regulatory policy in electing the appropriate option, or if the authority mandates a single course of action based on specific, objective terms. If the authority prescribes a course of action in specific and objective terms, and the government actor complies with the regulation, the action is presumed to be in furtherance of the policy of the regulatory regime, the discretionary function exception will not apply, and liability may attach.

Where, on the other hand, the government action involves an element of judgment or choice, the court must still proceed to the second part of the test, and ask "whether that judgment is of the kind that the discretionary function is designed to shield." *Berkovitz*, 486 U.S. at 536. The discretionary function exception will protect only those choices or decisions "grounded in the social, economic, or political goals of the statute and regulations." *Gaubert*, 499 U.S. at 323. The *Gaubert* Court created a presumption that when "a regulation allows the employee discretion... a discretionary act *authorized by the regulation* involves the consideration of the same policies which led to the promulgation of the regulations."[3] *Id.* at 324 (emphasis supplied). Thus, under the *Gaubert* analysis, it is only when a government actor's discretionary choice or decision is authorized or allowed by statute or regulation that the conduct is entitled

---

[3] Commentators have suggested that courts' interpretation of the *Gaubert* Court's presumption that discretionary decisions are grounded in public policy "drastically limits the potential exposure of the United States to liability." Mark C. Niles, *"Nothing But Mischief": The Federal Tort Claims Act and the Scope of Discretionary Immunity*, 54 Admin. L. Rev. 1275, 1329 (Fall 2002). This second layer of analysis may have been particularly effective in limiting the government's waiver of sovereign immunity, shielding it from liability in so-called "failure to warn" cases. *See* Bruce A. Peterson and Mark E. Van Der Weide, *Susceptible to Faulty Analysis,* United States v. Gaubert *and the Resurrection of Sovereign Immunity*, 72 Notre Dame L. Rev. 447 (1997) ("The handling of this and other 'failure to warn' cases since *Gaubert* provides telling examples of the impact of that decision....This type of liability has virtually disappeared in the wake of *Gaubert*.").

to the presumption that it is "grounded in *the policy of the regulatory regime*." *Id*. (emphasis supplied).

Yet, even then, the presumption is not absolute. The *Gaubert* Court made clear that even if the conduct involves a decision or choice, and the actor "permissibly exercise[s] policy choice," Berkovitz, 486 U.S. at 585, authorized by statute, regulation, or agency guideline, a plaintiff may defeat the presumption by "alleging facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory scheme." *Gaubert*, 499 U.S. at 325. I now turn to the application of the facts of the case to the discretionary function exception's analysis.

The conduct in question in this case is twofold: (1) the manner in which the government erected and maintained warning signs, and (2) the decision to remove warning buoys upstream from the Robert C. Byrd Locks and Dam. Because neither conduct is the result of an exercise of policy judgment granted by statute or regulation, the plaintiffs in this case do not labor under the difficulty of overcoming the presumption.

The decisions involved in determining the size, prominence, and readability of the warning signs upstream from the dam, as well as the initial decision to erect those signs, were not discretionary. The plaintiffs point to 33 C.F.R. § 207.300(s), which requires the local District Engineer to post warning signs in conspicuous and appropriate places upstream from all locks and dams. The regulation reads:

> (s) *Restricted areas at locks and dams:* All waters immediately above and below each dam, as posted by the respective District Engineers, are hereby designated as restricted areas. No vessel or other floating craft shall enter any such restricted area at any time. The limits of the restricted areas at each dam will be determined by the responsible District Engineer and *marked by signs and/or flashing red lights installed in conspicuous and appropriate places*. *Id*. (emphasis supplied). 33

8

C.F.R. § 207.300(s) (2002).

The court finds that, pursuant to the above statute, the initial decision to post either warning signs or lights is not discretionary.

The defendant argues that the Sixth Circuit cases, *Pearce v. United States*, 261 F.3d 643 (6th Cir. 2001), and *Gemp v. United States*, 684 F.2d 403 (6th Cir. 1982), finding that the regulation creates no duty on the part of the Corps to provide either signs or lights, should persuade this court to reach the same conclusion and find that the act of placing the signs was "discretionary." The Sixth Circuit reasoned that "[s]ince the regulation allows the District Engineers to determine the limits of any restricted areas, it follows that it is within their discretion not to designate any restricted areas for purposes of applying this regulation." *Gemp*, 684 F.2d at 408. The Sixth Circuit apparently interpreted the phrase "as posted by the respective District Engineers" to mean that, a District Engineer may choose not to "post" the waters above and below a dam at all, and that dams which are not *posted* must also not be *restricted*. However, nothing in the regulation justifies equating the task of posting the limits of a restricted area with the decision to restrict the area in the first place. On the contrary, the final sentence, which establishes that the District Engineer may determine the "*limits* of the restricted area at *each* dam," suggests that each dam should have a restricted area, the limits of which are to be determined by the District Engineer. The court believes this interpretation follows logically from the plain language of the regulation. Therefore, the initial decision to designate a restricted area upstream from the dam, and/or to erect signs or flashing lights marking the restricted area, is not discretionary.

Furthermore, the determination of how the signs should be erected was not a discretionary decision authorized by statute or regulation. The thrust of the plaintiffs' complaint is that the warning signs upstream

9

from the Robert C. Byrd Locks and Dam were inconspicuous or unreadable from the middle of the river. The regulation, 33 C.F.R. § 207.300(s), specifically requires that the District Engineer post signs in "conspicuous" places. When an agency uses words like "conspicuous," the agency is clearly not attempting to grant a government actor discretion, either expressly or impliedly.[4] Rather, it is the kind of precise, strong language embodied in the word "conspicuous" that signals an intent to remove discretion from the process, and foreclose the possibility of subjective decision-making by providing objective criteria.[5] Additionally, in 1989, the Corps produced a "Sign Standards Manual" that established precise guidelines for the creation of warning signs. Although compliance with the standards manual was not required until January 1, 2001, its existence supports the finding that the regulation was not intended to allow a government actor discretion in determining the appropriate size and prominence of warning signs. Thus, the conduct did not involve the necessary element of choice required to trigger the discretionary function exception to sovereign immunity.

For the foregoing reasons, the court **FINDS** that the discretionary function exception to sovereign immunity in the SIAA does not apply to the issue of the manner in which the government erected and maintained warning signs upstream from the Robert C. Byrd Locks and Dam.

However, the decision to remove the system of warning buoys during the rehabilitation project on the dam *was* discretionary. First, neither party has informed the court of a statute, regulation, or policy that

---

[4] The same regulation provides a counter-example. The determination of the range of the restricted area around the dam is clearly a discretionary decision, expressly granted to the District Engineer. If that decision was at issue here, there would be a presumption that it was based on the policies that the regulation was intended to promote.

[5] On what is "conspicuous," Supreme Court Justice Potter Stewart might have said "I know it when I see it."

either mandates a course of action regarding the installation or removal of the buoys, or grants a government actor discretion to make those decisions. The evidence suggests that the installation of the buoys was a local decision made in response to an increase in accidents at that particular site. Similarly, the decision to remove them was motivated by safety concerns for construction vessels operating within the restricted area. Thus, the decision to remove the buoys clearly involved elements of judgment or choice. Second, promoting safe operations at the dam is clearly a consideration grounded in public policy.[6] Thus, the decision to remove the warning buoys upstream from the Robert C. Byrd Locks and Dam is protected by the discretionary function exception to the SIAA, and therefore immune from the threat of liability.

## B. The United States' Duty to Warn Boaters of the Presence of a Dam

Having established that the discretionary function's exception to the waiver of immunity in the SIAA is inapplicable to the placement of conspicuous signs, and that therefore the government is not immune from suit, this court is free to consider the merits of the case pursuant to the subject matter jurisdiction conferred by the SIAA. The court will now address the issue of whether the defendant has met its burden of establishing the absence of a genuine issue of material fact. In support of its motion for summary judgment, the defendant argues that the United States owed no duty to the plaintiffs, that even

---

[6] The defendant would not benefit from the presumption created by the *Gaubert* Court in this case. The presumption created by *Gaubert* operates as follows: "if a regulation *allows* the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act *authorized by the regulation* involves consideration of *the same policies which led to the promulgation of the regulations*....When established governmental policy, *as expressed or implied by statute, regulation, or agency guidelines*, *allows* a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324 (emphasis supplied). There is, however, no indication in this case that the discretion exercised was *allowed* by an established policy that was expressed or implied by statute, regulation, or agency guidelines. In other words, discretion cannot be *allowed by* an established policy when there is no statute, regulation, or agency guideline *allowing* the discretion.

11

if the United States did owe a duty, that duty was satisfied, and finally, that the sole cause of the plaintiffs' accident was their own negligence.

**1. Duty Arising from a Regulation**:

The plaintiffs argue that the regulation, 33 C.F.R. § 207.300(s), establishes a duty on the part of the United States to warn upstream boaters of the dangers presented by the Robert C. Byrd Locks and Dam. Referencing the discussion of this regulation *supra*, the court **FINDS** that the regulation creates a "mandatory duty to conspicuously mark the boundaries of any area surrounding each dam it decides to restrict." *McMellon*, 338 F.3d at 296 (*overruled* on other grounds).

The violation of a regulation, however, gives rise to liability only when the plaintiffs are within the class of persons protected by the regulation and the harm they suffer is of the type the regulation was intended to prevent. It is clear that the purpose of the regulation was to ensure safe operation of the dam and protect the boating public by restricting the areas around locks and dams.[7] The defendant argues that the regulation was aimed solely at protecting the government's property from damage by trespassers. Other subsections of 207.300, however, deal more directly with property damage. *See* 33 C.F.R. § 207.300(b), (n), (o), (q). Thus, "it is logical to conclude that section 207.300(s) is directed at something in addition to the protection of the government's property." *McMellon*, 338 F.3d at 297. The presence of a dam across a navigable waterway poses an obvious safety hazard to boaters, and restricting areas above and below the dam may be the best and simplest way to protect them. Furthermore, the Corps has acknowledged that marking restricted areas around dams is critical to protecting the safety of

---

[7] The Fourth Circuit visited the issue of whether 33 C.F.R. § 207.300(s) created a regulatory duty in its panel decision in *McMellon v. United States*, 338 F.3d at 296-97.

the boating public.  *See Navigation Regulations; McClellan-Kerr Arkansas Navigation System*, 49 Fed.Reg. 10680 (March 22, 1984) (adding various regulations, including one largely identical to section 207.300(s), and noting that the added regulations "pertain to *safety items* which are essential to protect the locks and dams *and the users*" (emphasis supplied)).  Therefore, the plaintiffs, as members of the boating public, were within the class of persons that § 207.300(s) was intended to protect.  Also, the harm they suffered was a result of their contact with the dam, and thus it was clearly the kind of harm the regulation was intended to prevent.  Accordingly, the court **FINDS** that 33 C.F.R. § 207.300(s) creates a mandatory duty to post conspicuous warning signs in order to prevent harm to the boating public.

## 2.  Common Law Duty

General principles of maritime law, like the common law principles of tort, impose upon a defendant a duty to exercise ordinary care.  Included in this duty is the duty to warn of reasonably foreseeable harm.  *See Bubla v. Bradshaw*, 795 F.2d 349, 353 (4th Cir. 1986) ("The duty of ordinary care includes, of course, a duty to warn of harm that is reasonably foreseeable under the circumstances."); *see also Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980) ("In analyzing a maritime tort case, we rely on general principles of negligence law.  The plaintiff is owed a duty of ordinary care.  A defendant's failure to warn the plaintiff does not breach that duty, however, unless the resultant harm is reasonably foreseeable." (citation omitted)).  Several cases in this jurisdiction have addressed the issue of whether the government has a duty to warn boaters of obstructions to navigable waterways.

The first of these was *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975) (*overruled* on the issue of the implied discretionary function exception to the SIAA).  The *Lane* case involved a suit against the United States for damages incurred as a result of a plaintiff's collision with a sunken barge.  The plaintiff

13

argued that, pursuant to 33 U.S.C. §§ 409, 414, and 415, the United States had a duty to mark hazardous sunken vessels abandoned by their owners. The *Lane* court found that although the United States had no mandatory duty to mark every unremoved wreck in navigable waters, if the United States was aware of a submerged wreck that constituted a substantial hazard to navigation, it had a responsibility to exercise care and prudence in marking the wreck.

In factually similar cases since *Lane* the Fourth Circuit has found that the government owes no duty to warn boaters of potential dangers in navigable waterways. However, none of those cases suggest that the government owes no duty to warn boaters when it *creates* a dangerous obstacle to navigable waterways. On the contrary, general principles of maritime and common law require the opposite conclusion.

For example, in a similar case, *Faust v. South Carolina State Highway Dep't*, 721 F.2d 934 (4th Cir. 1983), the Fourth Circuit found that the government had no duty to warn. There, the plaintiff was killed when his vessel collided with a steel cable guide used by the South Carolina Highway Department in the operation of a cable ferry. *Faust* involved 33 U.S.C. § 403, a statute that gives the Corps the authority to regulate obstructions placed in the navigable waterways. In *Faust*, the court found that § 403 did not impose a duty on the government to protect the public from harm that might occur as a result of the government's failure to exhaustively carry out the mandate of the statute. The court explained that at common law, an undertaking to protect a person from harm does not give rise to an action in tort unless one or more of the following conditions exist: (1) the undertaking is in satisfaction of an antecedent legal duty, (2) the action increases the risk of harm, or (3) the person relies to his detriment upon the undertaking. *Faust*, 721 F.2d at 939. Indeed, the third condition reflects the Supreme Court's decision in *Indian*

14

*Towing Co. v. United States*, 350 U.S. 61 (1955).  There, the Court found that, although no antecedent legal duty exists, engendering reliance upon the government's safety measures creates a duty where none existed before and operates as an exception to the general common law rule that one cannot be found liable for endeavoring to protect the public from harm.  In *Faust*, the court found that none of the three conditions existed, and therefore the government had no *general* duty either to ensure that navigable waters are safe or to provide warning devices.

Accordingly, the court's conclusion in *Faust* that the government had no general duty to warn was built upon the presumption that the government had satisfied the condition that no antecedent legal duty existed.  Unlike in *Faust*, where the potentially dangerous obstruction causing the plaintiff's damage was built and maintained by the South Carolina Highway Department, the case at bar involves a dam that was built and maintained by the federal government itself.  Thus, this court must determine whether the federal government's *creation* of the obstruction to navigable waterways might create a *specific* or "antecedent" legal duty to warn of the dangers the obstacle may pose.  The Ninth Circuit, in *Sutton v. Earles*, referencing *Faust*, addressed this very issue.  The *Earles* court noted that "[f]or the *United States* to be liable in *Faust* would have required finding a general duty on the part of the United States to ensure the safety of navigable waters.  In contrast, our decision imposes no *general* duty to ensure the safety of navigable waters. We merely conclude that the Navy must take reasonable precautions to warn of dangers it creates by placing obstructions within the navigable waters of its Weapons Station." *Sutton v. Earles*, 26 F.3d 903, 912 (9th Cir. 1994) (emphasis in original).  The court finds the Ninth Circuit's reasoning to be persuasive and believes the distinction the *Earles* court makes is relevant to the analysis of this case.

The Fourth Circuit case whose facts are aligned most closely with those of the case at bar is

15

*Magno v. Corros*, 630 F.2d 224 (4th Cir. 1980). In *Magno*, the plaintiff sued the United States seeking damages for injuries occurring as a result of the decedent's boat's collision with a steel dike that was built and maintained *by the government*. Nonetheless, the court found that the government owed the plaintiff no *additional* duty to warn. A light that marked the channel side of the dike and served as a warning to boaters was clearly visible from the water, and was in good working condition. Further, the government had not engendered reliance by endeavoring to provide any additional warnings.

In *Magno*, however, the driver of the boat was familiar with the waterway, having successfully passed through the dike many times, and was presumably aware of both the dike and the warning light marking it. The *Magno* court found that "a decisive issue in this case is whether the United States was under a duty to provide additional lighting or some other type of marking on the dike as a warning to boaters in the area." The court concluded that no such duty existed, and remarked that the "[p]laintiff here has presented us with no authority and has introduced no evidence that would impose upon anyone a duty to mark the dike any more clearly than the United States did in this case. We decline to impose this even higher duty on the government." *Id*. at 228.

Because the *Magno* court found that the government had no even *higher* duty to provide *additional* warnings on the dike, it follows logically that the court implicitly acknowledged the existence of a *lower* duty to provide at least *some* warning of government-created obstacles to navigable waterways. Thus, the *Magno* court found that the placement of the warning light, which had successfully navigated the plaintiff safely through the dike many times in the past, satisfied that lower duty.

Unfortunately, neither the *Magno* decision, nor any Fourth Circuit decision following it, provides the court with guidance on how "strong" a warning signal must be in order to alert the reasonable boater

16

of the presence of danger and satisfy the minimal duty to warn implied by the *Magno* court. Nonetheless, the *Magno* court's acknowledgment of the existence of some lower duty implies that there must be circumstances where warnings about obstructions placed by the government in navigable waterways are so ineffective that they fail to satisfy even that lower duty. Any duty to warn mandates *some* warning at the very minimum, and so a warning system that amounts to no warning at all would be a breach of that duty.[8]

Because the plaintiff in *Magno* was aware of both the dam and the warning light, the facts in *Magno* suggest that the cause of the plaintiff's accident was more likely his failure to heed the warning that had guided him safely through dike many times in the past, than it was the ineffectiveness of the functioning warning light. That fact alone weighs heavily in favor of the court's ultimate conclusion that the warning system in place was adequate. However, it is a fact that is missing from the case at bar. The plaintiffs in this action were in unfamiliar territory, and remained unaware that the danger existed until it was too late. Thus, the facts of the case at bar, unlike those in *Magno*, make it more likely that the accident was a result of an ineffective warning system. It is the opinion of this court that the *Magno* decision recognizes the

---

[8] This conclusion is consistent with other courts' findings that the government owes some duty to warn boaters of dams that it operates. *See Dye v. United States*, 210 F.2d 123, 128 (6th Cir. 1954) ("Although the dam was constructed under lawful authority, a duty rested upon the operator of the dam to give adequate warning of a dangerous condition, when existing, and the failure to do so would impose liability upon the operator."); *Kohl v. United States*, 712 F.2d 286, 290 (7th Cir. 1983) (concluding that government had duty to warn of dam); *Doty v. United States*, 531 F.Supp. 1024, 1034 (N.D.Ill. 1982) ("As owner and operator of Lock and Dam 13 the Corps (and therefore the United States) had a duty to warn users of the Mississippi River that it is dangerous to approach too near to the dam."); *see also Pearce v. United States*, 261 F.3d 643, 650 (6th Cir. 2001) ("The district court determined that there was no negligence on the part of the Corps because, *while it had a duty to warn boaters of the dangers around the dam*, it satisfied that duty.... The district court's factual findings were sound and, based on those findings, its conclusion that the Corps was not negligent because it satisfied *its duty to warn of danger* was not in error." (emphasis supplied)); *Graves v. United States*, 872 F.2d 133, 136 (6th Cir. 1989) ("[T]he district court determined that there was no negligence on the part of the Corps because *it had met its duty to warn* of any hazards associated with the closing of the locks." (emphasis supplied)).

government's duty to install and maintain an effective warning system when it creates an obstacle to navigable waterways.

In addition to Fourth Circuit precedent, established common law principles also support the conclusion that the United States had a duty to warn the plaintiffs. In determining the existence and scope of a duty, it is appropriate for the court to rely upon either the Restatement (Second) of Torts or the common law of the state in which the accident occurred. *Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) ("[I]t is clear that the general maritime law may be supplemented by either state law, or more general common law principles.... Accordingly, we determine that the common law as compiled in the Restatement (Second) of Torts should control our evaluation of Wells's claim."). The Restatement (Second) of Torts § 337 states:

> *Artificial Conditions Highly Dangerous To Known Trespassers*:
> A possessor of land who maintains on the land an artificial condition which involves a risk of death or serious bodily harm to persons coming in contact with it, is subject to liability for bodily harm caused to trespassers by his failure to exercise reasonable care to warn them of the condition if (a) the possessor knows or has reason to know of their presence in dangerous proximity to the condition, and (b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved.

RESTATEMENT (SECOND) OF TORTS § 337 (1965). West Virginia adopted this principle in *Huffman v. Appalachian Power Co.*, 415 S.E.2d 145, 152 (W. Va. 1991), when the Supreme Court of Appeals of West Virginia found that owners of real property who maintain a highly dangerous condition or instrumentality upon the property owe a duty of ordinary due care to trespassers.

The government surely was aware of the presence of water craft upstream, traveling downstream towards the dam, as well as the dangers that the dam presented to boaters who were unaware of its

presence. Because the submerged portion of the dam did not rise above the water, the dam was difficult to see. In fact, the plaintiffs allege that they believed the dam was a bridge, thereby never realizing the risk involved in coming into close proximity with a dam.

Nonetheless, the defendant argues that the dam was open and obvious, and therefore there is no duty to warn of the dangers it presents. It is well-settled law that there is no duty to warn of an open and obvious danger that an ordinary prudent person would take reasonable steps to avoid. The defendant argues that the dam must be open and obvious because the plaintiffs admitted to seeing the dam. However, it is the *danger presented by the dam* that must be obvious, not the dam itself. The plaintiffs admit they saw the dam as they approached it, but because they believed it to be a bridge, they were unaware of the danger of going over a dam.

The most obvious indication of the danger posed by the submerged portion of a dam in the plaintiffs' path was the significant drop in the water level at the spillway. Clearly, an object's obviousness has a direct relationship to how close one is to the object, and the elevation change at the spillway of a dam is arguably difficult to discern from a distance. Furthermore, the danger posed by the dam does not exist at the dam itself but at the point where efforts to reverse course and avoid going over the dam would be overcome by momentum and current. Finally, the plaintiffs' momentum is directly related to the reasonableness with which they were operating their water craft; a disputed issue of fact in this case. Therefore, the court finds that the facts, construed in a light most favorable to the plaintiff, reveal a genuine issue of material fact as to whether the dam was open and obvious. Accordingly, the court **FINDS** that the government owed a duty to boaters to provide adequate and effective warning of the presence of the Robert C. Byrd Locks and Dam.

### C. Remaining Issues

Finally, the defendant argues that the case must be dismissed because the plaintiffs' negligence was the sole cause of the accident. However, the defendant fails to establish facts that would allow the court to decide this issue on the merits. On the contrary, the defendant attempts to prove the plaintiffs' negligence through conclusory accusations of "speeding," "recklessness," or "joy-riding." These allegations, without more, fail to rebut the plaintiffs' evidence, consisting of affidavits and deposition testimony, showing that the signage above the Robert C. Byrd Locks and Dam was ineffective in signaling boaters traveling the middle of the channel.

Accordingly, the defendant's motion for dismissal, or in the alternative, for summary judgment, is **DENIED.**

The court **DIRECTS** the Clerk to send a copy of this Written Opinion and Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at http://www.wvsd.uscourts.gov.

        ENTER:      October 18, 2005

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE