**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

CARRIE A. MCMELLON, et al.,

                Plaintiffs,

v.                                    CIVIL ACTION NO.  3:00-0582

UNITED STATES OF AMERICA, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

On July 11–12, 2006, the court conducted a trial of this action.  After considering the evidence and the arguments of counsel, I make the following Findings of Fact and Conclusions of Law.

*I. Findings of Fact*

1.      This action arises from the Suits in Admiralty Act, 46 U.S.C. §§ 741 et seq., and is a case of admiralty and maritime jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure.

2.      On August 5, 1999, the four plaintiffs—Carrie McMellon, Lori White, Kathy Templeton, and Cheri Call—were operating two personal watercraft ("PWCs") on the navigable waters of the United States near the Robert C. Byrd Locks and Dam ("the Dam") on the Ohio River near Gallipolis Ferry, West Virginia.

3.      The defendant, the United States of America, was at all relevant times the owner and operator of the Dam.

4.      On August 5, 1999, the four plaintiffs traveled together by car from Cheri Call's house in Culloden, West Virginia, to a campground several miles upriver from the Dam.  In traveling to the campground on Route 2, the plaintiffs went past the Dam, but do not recall seeing any of the three signs identifying the presence of a dam from Route 2.

5.      Shortly after arriving at the campground, the plaintiffs embarked on the PWCs into the river to look for Lori White's mother, who was on the river in a boat.  Initially, the plaintiffs proceeded upstream but then turned around and headed downstream.

6.      Carrie McMellon drove one PWC with Cheri Call as her passenger; Kathy Templeton drove the other PWC with Lori White as her passenger.

7.      The plaintiffs had little experience in recreational boating; only Carrie McMellon and Lori White had any experience operating PWCs.  They were unaware of any hazards, obstructions, or problems with this part of the Ohio River, and did not look at any navigational charts, maps, or publications of the area.

8.      None of the plaintiffs had ever before been at or around a lock and dam.

9.      The plaintiffs operated their PWCs at speeds of approximately 30–40 mph.  The plaintiffs
        operated their PWCs in a reasonably prudent manner.  No evidence was introduced showing
        that the plaintiffs were negligent in the operation of the PWCs.

10.     The Dam consists of a dam and locks.  It is located on the Ohio River nine miles below
        Gallipolis, Ohio.  It is a non-navigable, high-lift gated dam, 1,116-feet wide and has
        openings of 125.5-feet wide for the roller gates placed between piers 16-feet wide.  The Dam
        is separated from two locks on the West Virginia side by an island in the river.

11.     Proceeding toward the Dam, the plaintiffs saw a structure that they believed to be a bridge
        and proceeded to go under it between one of the large gaps in the piers.  A former lockmaster
        at the Dam conceded the dam looks like a bridge from upriver.  The top of the Dam in fact
        serves as a service bridge for personnel working on the Dam.

12.     The plaintiffs did not see any warning signs or other warnings of danger en route to the Dam.

13.     The plaintiffs did not perceive the change in river elevation until a point too late to take
        action to prevent falling over the Dam.  Both PWCs fell approximately 23-feet over the Dam
        and into the river below.

14.     The Corps of Engineers had designated the area above the Dam as a "restricted area" prior
        to the accident.

15.     Clifford Phillips, the lockmaster from 1997 through the time of the accident, testified he was aware that pleasure boaters often operated around the Dam and that the boaters often were not familiar with the dangers of the Dam.

16.     The restricted area above the Dam was marked with warning signs considered "safety critical" because the signs related to information that if not known, could be hazardous to people in the area; no flashing red lights were used to designate the restricted area.

17.     The signs designating the restricted area were not in conspicuous and appropriate places. Boaters in the middle of the river would not be alerted of the signs or the dangers the signs warned against.

18.     The lockmaster, nor any other employee at the Dam, created a schedule to inspect the Dam's warning system.  The lockmaster had the authority to ask for new signs but never did.  The lockmaster, nor any other employee at the Dam, ever attempted to determine whether the signs could be read from the middle of the river.

19.     The warning system was not regularly inspected or maintained.

20.     The brush around the signs was cut only when the lockmaster received complaints.  On the day of the accident, the warning side on the Ohio bank was obscured by brush from boaters traveling past the sign toward the Dam.

21.    The defendant was required to comply with 33 C.F.R. § 207.300(s) and Corps Regulation 1130–2–23, 6.b at the time of the accident.

22.    The plaintiffs proceeded over the Dam because they did not know they were traveling in a restricted area or that the structure they believed to be a bridge actually was a Dam.  Based on the pictures introduced at trial, a reasonable person would not see the change in water elevation until only a few feet prior to going over.  The Government introduced no pictures of the area and objected when asked if I should view the actual site in person.

23.    Carrie McMellon, 19-years old at the time of the accident, remained on the PWC over the Dam and landed on top of it, which caused impact to her spine and caused her to lose feeling in her legs for a period of time.  She suffered a burst fracture of the L-5 vertebra with L-5 and S-1 nerve-root lesions.  The L-5 and S-1 vertebrae had to be fused together and two titanium rods had to be installed into her spine for stabilization.  Ms. McMellon spent two weeks in a rehabilitation hospital and wore a clambshell-type brace for approximately three months.  The accident described above directly and proximately caused her injuries.  She incurred reasonable and necessary medical expenses of $60,869.60 and must incur a future surgery to remove the titanium rods from her spine.  The additional surgery will cost $14,000.  Ms. McMellon incurred significant pain and suffering from the accident.  She also incurred $4,000 in lost wages following the accident.  The accident caused her to have a permanent impairment rating of 29 percent of the whole person.

24.    Lori White, 25-years old at the time of the accident, also landed in the water while on top of a PWC.  She suffered compression fractures of the T-12 and L-1 vertebrae, a crushed disc, and two broken ribs.  Ms. White was hospitalized for four days and placed in a clambshell-type brace for three months.  Her injuries greatly impair her daily life activities and her ability to raise her children.  Her medical bills to date are estimated at $11,000, and she has been diagnosed with post-traumatic stress disorder following the emotional distress from the accident.  The accident described above directly and proximately caused all of Ms. White's injuries.  She has incurred significant pain and suffering from the accident, and has a permanent impairment rating of 7 percent of the whole person.

25.    Kathy Templeton, 27-years old at the time of the accident, spent approximately $700 to treat physical injuries relatively minor compared to Ms. McMellon and Ms. White.  The fourth plaintiff, Cheri Call, 23-years old at the time of the accident, also sustained minor injuries approximating $90 of medical expenses that caused her to lose $300 of wages at work.  Ms. Templeton and Ms. Call incurred pain and suffering from the accident.  The accident described above directly and proximately caused all of Ms. Templeton's and Ms. Call's injuries.

## II. Conclusions of Law

As explained in an earlier opinion, the United States's duty to mark the restricted area above the Dam with warning signs or flashing red lights was not a discretionary function.  *McMellon v. United States*, 395 F. Supp. 2d 422, 431 (S.D. W. Va. 2005).  Although the responsible district

-6-

engineer had discretion in determining what area around the Dam would be considered "restricted," once this decision was made, the applicable regulation mandates that this determined "restricted area" be marked with signs or lights in conspicuous and appropriate places:

> *Restricted areas at locks and dams.*  All waters immediately above and below each dam, as posted by the respective District Engineers, are hereby designated as restricted areas.  No vessels or other floating craft shall enter any such restricted areas at any time.  The restricted area at each dam will be determined by the responsible district engineer and market [sic] by signs and/or flashing red lights installed in conspicuous and appropriate places.

33 C.F.R. § 207.300(s) (1999).  This regulation places a duty upon the responsible district engineer to mark accordingly the area designated as a "restricted area."  Based on the above Findings of Fact, I conclude that the defendant breached the duty imposed by 33 C.F.R. § 207.300(s) and the common law duty to warn of open and obvious dangers.

The defendant claims the regulation was not breached because signs merely have to be placed in places that are conspicuous and appropriate.  In other words, the defendant argues that the size of the signs or the fact that they cannot be read from the middle of the river is irrelevant. Taking the defendant's argument to the extreme, however, would mean that the United States could satisfy its regulatory duty merely by posting signs that are 1-inch by 1-inch as long as the signs were in places considered conspicuous and appropriate—for example, on top of the Dam itself. Undoubtedly, the signs have to be readable and able to catch a boater's attention to have any value whatsoever.  The signs around the Robert C. Byrd Locks & Dam were not positioned to catch a boater's attention to adequately warn of the Dam's dangers.  The lack of adequate signage combined with the absence of any warning lights makes the Dam's warning system inadequate.

The inadequacy of the Dam's warning system directly and proximately caused the plaintiffs to topple over the Dam at high speeds on August 5, 1999.  The injuries described above were

directly and proximately caused by the defendant's failure to address the Dam's inadequate warning system.

Accordingly, I award damages as follows:

-To Ms. Call:

$90 for medical expenses, $300 for lost wages, and $10,000 for pain and suffering

-To Ms. Templeton:

$700 for medical expenses and $10,000 for pain and suffering

-To Ms. White:

$11,000 for medical expenses and $350,000 for pain and suffering

-To Ms. McMellon:

$74,869.60 for medical expenses, $4,000 for lost wages, and $350,000 for pain and suffering

The plaintiffs' total damages are $810,959.60. Under the Suits in Admiralty Act, the amount of total damages is subject to a prejudgment interest rate of four percent per year from the date the Complaint is filed. I thereby **ORDER** the defendant to pay a judgment award of **$810,959.60 plus prejudgment interest** to the plaintiffs.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        July 26, 2006

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE